# EXHIBIT 1

1              IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4

THE UNITED STATES OF AMERICA,      .

5                 .

               Plaintiff,   .   No. 87 CR 340

6                 .

7           v.          .   Chicago, Illinois

                 .

GUSTAVO CHAVERRA-CARDONA,      .   Wednesday,

8                 .     November 18, 1987

           Defendant.   .

9                 .   9:30 a.m.

                 .

10 .  .  .  .  .  .  .  .  .  .  .  .  .  .

11

12         TRANSCRIPT OF SENTENCING PROCEEDINGS

        BEFORE THE HONORABLE NICHOLAS J. BUA

13

PRESENT:

14

For the Government:        ANTON R. VALUKAS

15                      THOMAS J. SCORZA

16  For the Defendant:        BRYAN DAVID SCHULTZ

17  For the Probation         PAUL A. LUCERO,

    Department:             Probation Officer

18

19  Official Court Interpreter:   VICTORIA FUNES

20                      _____

21

22

23

24

25

1    THE CLERK:  87 CR 340, United States of America versus Gustavo

2  Chaverra-Cardona.  For sentencing.

3    MR. VALUKAS:  Good morning, your Honor.

4    THE COURT:  Mr. Valukas.  Good morning.

5    MR. SCORZA:  Good morning, your Honor.

6    THE COURT:  Mr. Scorza.

7    MR. SCHULTZ:  Good morning, your Honor.  For the record, Bryan

8  Schultz on behalf of Gustavo Chaverra.

9    THE COURT:  Good morning.  Mr. Schultz, do you know of any

10  reason why we should not proceed to sentencing the defendant,

11  Mr. Chaverra-Cardona, this morning?

12    MR. SCHULTZ:  No, your Honor.

13    THE COURT:  Mr. Valukas?

14    MR. VALUKAS:  None, your Honor.

15    THE COURT:  Mr. Chaverra, have you had an opportunity to read

16  the Presentence Investigation Report completed by the Probation

17  Office in connection with your sentencing hearing this morning?

18    MR. CHAVERRA:  Yes, your Honor.

19    THE COURT:  Have you had an opportunity to discuss the report

20  with Mr. Schultz, your attorney?

21    MR. CHAVERRA:  Yes, your Honor.

22    THE COURT:  Is there anything in the report that you wish to

23  challenge as being inaccurate or untrue?

24    MR. CHAVERRA:  Well, no, your Honor.

25    THE COURT:  Mr. Schultz?

1    MR. CHAVERRA:  There are some things that I do want to tell

2  you, but the report is fine.

3    THE COURT:  Okay.  Mr. Schultz, is there anything you find in

4  the Presentence Investigation Report you wish to challenge  as being

5  untrue or inaccurate?

6    MR. SCHULTZ:  There is one statement.  After I appeared at the

7  Probation Department and read the report and signed the report, I

8  took it to my client.  At that time, there was added to it a state-

9  ment by the defendant's sister.  I have no quarrel--

10    THE COURT:  Have you seen that, by the way?

11    MR. SCHULTZ: Yes, I have.  Yes, I have, your Honor.  I have no

12  quarrel--

13    THE COURT: Has the government seen that?

14    MR. SCORZA:  Yes, your Honor.

15    THE COURT:  Okay.

16    MR. SCHULTZ:  --with the Probation Department including that.

17  For that matter, I don't know whether the defendant's sister made

18  that statement or not, but I would like to make it clear that--

19    THE COURT:  Well, I can tell you whatever appears in the

20  Supplemental Report, that is not going to form any basis for the

21  court's sentencing of your client.  Okay?

22    MR. SCHULTZ:  Very well.

23    THE COURT:  Anything else?    I see something in the report

24  that should be corrected.

25        The report indicates that the fine in connection  with the

1  offenses contained in Counts Two, Three and four is $25,000 for each

2  of those counts.  I believe the fines are $250,000 for each count.

3       MR. SCORZA:  Judge, that was going to be our one correction.

4  It appears both on the face page, an error with respect to the fine,

5  and on page 1.  The fine is $250,000 for each of the counts except,

6  apparently, for Count One.  The Count One statute doesn't have a

7  fine provision.

8       THE COURT:  That was not in error because they indicate just a

9  blank space.  Very well.

10      Mr. Schultz, do you wish to say something on behalf of

11  your client before the court passes sentence upon him?

12      MR. SCHULTZ:  Yes, I do, your Honor.

13      THE COURT:  Very well.

14      MR. SCHULTZ:  Your Honor, the crime, the offense, which

15  Mr. Chaverra has been charged with in a four-count indictment is a

16  very serious offense.  There is no question in my mind and in the

17  mind of my client that it is a very serious offense.

18      What I think is appropriate and what I would ask the court

19  to consider this morning is the critical fact that that offense was

20  not carried out.  It is a serious offense because it threatened the

21  harm or death to persons as opposed to merely a threat against

22  property.  And I think that is the more serious because it

23  threatened harm to officials of the government charged with the

24  responsibility of prosecuting crimes.

25      But, as I said, the fact is that that crime was not

1  carried out.  I think there have been some matters presented to your

2  Honor to suggest that the crime would have been carried out but for

3  the fact that the government interceded on the date it returned the

4  indictment and effected the arrest of all the persons involved.

5          However, I think it has also been drawn to your attention

6  through the report of one of the government agents, which was not

7  made known to the jury because of an evidentiary ruling, a state-

8  ment by the agents that they had obtained from Mr. Chaverra's wife

9  at which time Mr. Chaverra stated that he was surprised to learn

10  that the purported assassins were in town and he wanted them to be

11  gotten away.  And as I recall, his statement was, or her statement

12  of Mr. Chaverra's statement was that if the offense is going to be

13  committed, he will do it in the future, which I think is something

14  less than a definite statement that "the crime is going to be

15  committed now".

16          In addition, I think that it is also appropriate, and we

17  would ask the court to consider the fact as to the evidence that the

18  conspiracy was imminent in its completion or the completion of its

19  criminal intent, there was no money that was ever paid.  I believe

20  that common sense suggests that there was some reservation in

21  Mr. Chaverra's intent to commit the offense insofar as he did not

22  make firm financial commitments.  I think that in that milieu,

23  money, of course, is the most important consideration.  And I think

24  it is fair to ask the court to consider the lesser culpability of

25  Mr. Chaverra because he did not finalize the transaction by putting

1   up money.  By that, I mean that if the job was to be done tomorrow,

2   I think Mr. Chaverra understands that in that milieu, the money has

3   got to be paid "in front".  And there was no money that was actually

4   paid.  I think that it is fair to say that that is a reason to

5   believe that Mr. Chaverra had something less, his state of mind was

6   something less  than the most culpable in determining to initiate

7   this conspiracy and plot.

8        I think the defendant's state of mind is a matter of

9   very grave importance in this case because the indicia of this

10  offense are otherwise not present.  As I said, there was no money.

11  There were no weapons.  There was conversation on May 6, which it

12  has been argued reveals that Mr. Chaverra had knowledge of weapons,

13  automatic weapons, and machine guns, and so forth, but there was

14  never any act by Mr. Chaverra or an act by Mr. Chaverra's agents

15  outside the Metropolitan Correctional Center to actually supply

16  weapons to the individuals who were assassins, and I think by the

17  testimony of the informant, that was one of the terms of the agree-

18  ment, that the agreement was executory until such time as guns and

19  moneys were supplied to the assassins.

20       I think that as to all of those things, it could be

21  argued they were simply not carried out because of good investiga-

22  tive work by the government, and I don't challenge that, but I would

23  also ask the court to consider the other possibility, and that is

24  that there was some reservation by Mr. Chaverra, that it is possible

25  to attach some credence to Mr. Chaverra's testimony in which he

1  admits that he had conversations with the informant, and he admits

2  that he discussed the possiblity of causing harm to or otherwise

3  preventing the government witness from giving testimony against him.

4         Beyond that, there really isn't anything tangible that

5  Mr. Chaverra did.  There were no telephone calls that Mr. Chaverra

6  made in which he furthered the conspiracy.

7         Mr. Chaverra testified that he had no knowledge that a

8  meeting was set up at the Ravenswood Hospital.  And I think that it

9  is also fair to suggest to this court that Mr. Chaverra did not, in

10 fact, have any knowledge of a meeting at the Ravenswood Hospital.

11 There was no meeting that took place.  I don't think that that's in

12 dispute, as one indication that there was no meeting organized by

13 Mr. Chaverra. And I think the evidence that Mr.Chaverra had

14 knowledge of the meeting was supplied by the fact that an anonymous

15 phone caller contacted the informant, not the agent, but contacted

16 the informant at the hospital, and indicated that there was a meet-

17 ing, and the individuals who were to participate in that meeting

18 would eventually show up at the hospital.  In fact, as I recall,

19 they never did show up.  And it was never established as to the

20 identity of that caller.  The identity of this caller was never

21 established.

22         I believe that the informant testified during the trial

23 that he believed or he was certain--my recollection is a little bit

24 shaky on that--that the individual who placed the call to the

25 Ravenswood Hospital was the girlfriend of Mr. Chaverra.  I think

1  Mr. Chaverra did vehemently deny that he has a girlfriend.  That is
2  a very important fact for him.  But he is equally vehement in his
3  denial that he contacted anyone to notify anyone at the Ravenswood
4  Hospital as indication of the fact that he simply did not know that
5  that meeting was going on.

6         I think that as Mr. Chaverra will expand on in his state-
7  ment to the court, Mr. Chaverra also in contradiction to testimony
8  by the informant did not have any girlfriend or any woman other than
9  his wife visit him at the MCC.  I think that fact is evidenced by a
10 document that Mr. Chaverra has brought to my attention which I think
11 he will ask the court to make part of the record, and that is the
12 scheduled list of visitors which he is authorized to have at the
13 Metropolitan Correction Center.

14        So I think what it comes down to, as I said, is the state
15 of mind of Mr. Chaverra.  Also, I would ask this court to give con-
16 sideration to and exercise its right to be merciful based on the
17 fact that the crime that Mr. Chaverra committed  and, in fact, he
18 did commit, because the jury found him guilty of it, was the dis-
19 cussion of causing harm to another person.  I think an illuminating
20 document in that regard is the statement that Mr. Chaverra has sub-
21 mitted to this court as part of the Presentence Investigation in
22 which he fully accepts his responsibility for the offense, and
23 states that he deeply regrets:

24              "I deeply regret that my conversations with
                a fellow inmate set in motion a plot, the
25              purpose of which was to cause physical harm

1            to Mr. Ruben Castillo, Fanny Altamirano and
        her children".

2    Mr. Chaverra accepts responsibility for the fact that what he did

3    at the Metropolitan Correctional Center did set in motion a plot to

4    commit an offense which is extremely serious. But I think that he

5    also in that statement indicates to the court that he never fully

6    realized that the words that he had stated were understood to mean

7    that the agreement had been completed and that he really wanted

8    someone killed or that he really wanted something done to the

9    particular individuals.

10        In that statement, he also says that:

11
12           "I now realize that the things that I talked
        about with Eddie Ayala were interpreted by
        him as plans to commit murder. I deeply
13           regret that, but I'm grateful that no one
        was ever physically harmed or the purpose of
14           the plot carried out by anyone."

15   I think that is a very important fact and would ask that the court

16   give it due consideration in determining the punishment that is

17   appropriate in this case.

18        The issue of a man's state of mind, I think, is something

19   that is probably as difficult to determine and assess and impose a

20   punishment for as any other fact that has to be determined by a

21   trier of fact.

22        Supreme Court Justice Vinson in Commissioner of Internal

23   Revenue v. Culverson said:

24           "The triers of fact are constantly called
        upon to determine the intent with which a
25           person acted."

1          Nearly three quarters of a century ago, Justice Bowen made

2    the classic statement that:

3                    "The state of a man's mind is as much a fact
                     as the state of his digestion."

4    I think that that applies in this case.  What the court really must

5    determine is just exactly what intent Mr. Chaverra had in having his

6    conversations with another inmate at a time when I think it is also

7    reasonable  to assume that he was feeling--I think anyone would--

8    and had the state of mind of a man that is held in custody and

9    charged with another very serious crime.  I think that that can

10   engender a certain amount of frustration, a certain desperation,

11   which I think could cause me at an off-moment to make an improper

12   comment about the persons that are involved in prosecuting me, and

13   I would regret to admit if I was in that situation, I think I might

14   even wish harm to those individuals.  But whether that would

15   constitute a crime is a determination that is made by the trier of

16   fact.  In this case, the trier of fact, the jury, made that

17   determination.  But it is also within the power of this court to

18   ameliorate the penalty that will be imposed, that is to be imposed,

19   against Mr. Chaverra on the basis of his conduct.

20        Your Honor, I realize that the court is not bound by the

21   United States Sentencing Commission Guidelines.  That statute

22   is not in effect for purposes of this sentencing.  But on the basis

23   of the fact that the United States Sentencing Commission has

24   determined that its Sentencing Guidelines are based on the specific

25   crime, the specific offense-related characteristics, adjustments

1  based on the conduct of the defendant, and the criminal history of

2  the defendant, I think that it is appropriate to ask this court to

3  consider the wisdom of the Sentencing Commission in establishing

4  Guidelines.  I have determined...this is a four-count indictment--

5       THE COURT:  Did you take a crash course in determining what the

6  Guidelines would provide in this case, Mr. Schultz?

7       MR. SCHULTZ:  I have studied the Guidelines rather closely,

8  your Honor, and I have studied them close enough to be able to

9  calculate--

10      THE COURT:  What was the offense level in the Guidelines?

11      MR. SCHULTZ:  Okay; the offense level is 20. The offense level

12  for Count One is 20.  On Count One, that offense level, the

13  specific characteristics of the offense, that level of 20 would be

14  adjusted by the fact that there was more than minimal planning in

15  this case.  It is also adjusted, that offense level is adjusted--

16      THE COURT:  That is an additional 2 points?

17      MR. SCHULTZ:  Yes, your Honor, that is an additional 2 points.

18  The adjustment is also adjusted by 3 additional points for the fact

19  that in Count One, it is an offical victim.  And it is also--

20      THE COURT:  Did you group all of the charges?

21      MR. SCHULTZ:  Yes, I did.   Yes, I did.  The multiple...yes, I

22  have done that as well, your Honor.

23      THE COURT:  All four counts?

24      MR. SCHULTZ:  Multiple count adjustments in Part B of

25  Chapter 5.  Yes, I did, your Honor.   And it calculates that on the

1  basis of the Guidelines, Counts One and Three would be considered

2  together or grouped together by virtue  of the fact that it is a

3  single victim and a single transaction.  It is appropriate--

4       THE COURT:  Single victim?

5       MR. SCHULTZ:  Counts One and Three are a single victim, your

6  Honor.

7       THE COURT:  I see.

8       MR. SCHULTZ:  And Counts Two and Four are a single victim, and

9  the same transaction.  The aggregate offense level for Counts One

10  and Three is a 28, for Counts Two and Four is a 24, your Honor.  In

11  addition to which the offender chracteristic, or the offender

12  criminal history, reveals that Mr. Chaverra...there is some question

13  in my mind as to whether it would be a 2 based on the fact that he

14  was convicted of another offense while he was awaiting trial on this

15  chsrge.  But I also think that it might possibly be considered a

16  related  offense which cannot be considered as a prior offense by

17  virtue of the fact that the indictment indicates that that prior

18  charge is--

19       THE COURT:  So you gave every doubt to your client in computing

20  those figures?

21       MR. SCHULTZ:  No, not at all, your Honor.  Not at all, your

22  Honor.  The fact is that I included that.  I did not...I am saying

23  that I believe that it might not be a 3, although I made my calcu-

24  lation based on the fact that my client's criminal history, the

25  Guidelines would determine that it is a 3, and would determine that

1322

1  it is a prior separate offense.

2      On the basis of those calculations, your Honor, the com-

3  bined offense level, taking the most serious offense level, that

4  being for Counts One and Three, which is 28, adding to it one unit,

5  which is mandated by the Guidelines based on the criteria--

6      THE COURT: Related, yes.

7      MR. SCHULTZ:  --it comes out to a 29, an offense level of 29.

8  Ultimately, I determined that acceptance of responsibility of my

9  client, I think it is fair to reduce that offense level of 29 by 2

10  points based on the fact that my client does accept his responsi-

11  bility for this offense, and I think that is evidenced by the state-

12  ment that he has submitted to the court in his Presentence

13  Investigation.  And on the basis of that, your Honor, the over-all

14  offense level as mandated, which I acknowledge is not applicable or

15  required of this court to consider in this case, but ultimately it

16  comes out to a 27, which means that the Guidelines for Sentencing

17  are 78 to 97 months which would be a period of six years and six

18  months to eight years and one month.

19      Your Honor, I also recognize that this court may impose a

20  fine on Mr. Chaverra, and I am aware that the statute provides,

21  that there is a statute which provides that a fine may be imposed of

22  up to $250,000.

23      I also consulted the Sentencing Guidelines, and the

24  Sentencing Guidelines would indicate that the court should impose a

25  fine, and that that fine should be not less than $12,500 and not

1323

1    greater than $125,000.  However, the Guidelines also indicate in a

2    Policy Statement that the court may consider and should consider in

3    determining whether to impose a fine that appropriate punishment be

4    imposed for the conduct, and that the fine reflect the seriousness

5    of the offense, and that the fine promote respect for the law and

6    that it serve as a deterrence to further crime.  But in those same

7    list of criteria, your Honor, the United States Sentencing

8    Commission has set forth additional criteria that the court should

9    consider or is allowed to consider, and I think that it is particu-

10   larly germane in this case.  That would be, one, the defendant's

11   ability to pay...that is Point 2 of the Guidelines.

12           Point 3 is the burden which the imposition of a fine would

13   place on the defendant and his dependents.

14           The defendant, Mr. Chaverra, has three children under the

15   age of 10 who, right now, are temporarily in the custody of friends

16   of the family.  I think it is reasonable to expect that those

17   children are going to be  in the care of someone other than their

18   parents for a good many years.  And on that basis, if the court

19   imposes a fine, and allows Mr. Chaverra's home to be seized, or

20   allows the assets of his video business which, as of the most recent

21   valuation for purposes of sale, are $10,000, if the court allows

22   those things to be forfeited from Mr. Chaverra, in fact, the court

23   will be making those children destitute, children who already will

24   be suffering the lack of parents for the years during which their

25   parents are in custody, but also will be made destitute, and

1   ultimately the responsibility or charge of the government or a
2   charge of the taxpayers to maintain their support.

3        So I would ask in view of the ability of Mr. Chaverra to
4   pay...I might add by the way that the financial circumstances of
5   Mr. Chaverra have made it impossible for him to complete payment of
6   my fee, although I think that is certainly not the court's concern,
7   and I wouldn't ask the court to give that any consideration.  I
8   think it is merely an indication of Mr. Chaverra's financial situ-
9   ation.

10       However, the statements that I made concerning the
11  Sentencing Guidelines do not bind this court. What binds this court
12  are the statutes that are in effect today.  And the statutes which
13  are in effect permit this court to sentence Mr. Chaverra
14  consecutively for the offenses in Counts One and Three and Counts
15  Two and Four.  However, the fact is that it was a single
16  transaction.  It was a single transaction which actually was a
17  continuation of charges which would have been placed against
18  Mr. Chaverra and on which he was found guilty before another judge
19  in this building.  And, by the way, I would add that in that other
20  case, Mr. Chaverra has been sentenced to two terms of fifteen years
21  which are to run consecutively.  I think that the punishment that
22  has been meted out in that case is sufficient to satisfy  the
23  requirements of justice, to appropriately punish Mr. Chaverra, and
24  to deter any further criminal conduct.  To sentence Mr. Chaverra to
25  further consecutive terms is essentially to sentence his children to

1325

1  have no parents for the rest of their lives.

2          I think that Mr. Chaverra has not been convicted of any

3  offense prior...he admits to have committed offenses on the stand in

4  connection with narcotic trafficking, but Mr. Chaverra has not been

5  convicted of any other offenses than the two related offenses that

6  he stood trial for this year.

7          I think there is every reason to believe that notwith-

8  standing the seriousness of these crimes, that there is a

9  rehabilitative potential for Mr. Chaverra, and that the value of his

10  children having parents should be considered.  I would note that

11  Mr. Chaverra's wife and the children's mother is also in custody for

12  her part in another criminal offense.

13          Mr. Chaverra, since the time he has been convicted in this

14  case has given, I know, because I have spent considerable time with

15  him, a great deal of thought to his involvement in the criminal

16  milieu that he was previously involved in.  And ultimately, about a

17  week ago, Mr. Chaverra said to me, not for purely altruistic reasons

18  and I wouldn't deny that for a moment, and directed me to contact

19  the United States Attorney's Office and to offer to them or to ask

20  them if they would be interested in, offer to them, offer to submit

21  to interview by them to provide them all of the information he has

22  about narcotics  trafficking practices  as well as the personnel

23  involved in that narcotics trafficking.  That offer was made not-

24  withstanding Mr. Chaverra's reluctance to identify individuals when

25  he testified from the stand, although he identified some.  But I

1  think that is accounted for by the fact that as Mr. Chaverra pointed

2  out, he is concerned about the lives of his wife and his children

3  and he hopes that with assurances that his wife and his children

4  will be protected, he is anxious to cooperate  with the government.

5          I submitted a letter on 16 November...did you receive a

6  copy of this, Mr. Scorza?

7      MR. SCORZA:  Yes, your Honor.  We had letters that crossed in

8  the mail--

9      MR. SCHULTZ:  Pardon?

10     MR. SCORZA:  --from me to him and from him to me.

11     MR. SCHULTZ:  Well, actually, yours came by messenger in the

12  afternoon,  and mine, I think, was by messenger.

13         But I would ask that this be made a part of the record,

14  your Honor.   This is a letter directed to Mr. Scorza on 16

15  November 1987 which confirmed a conversation I had with Mr. Scorza

16  that morning in which I conveyed to Mr. Scorza Mr. Chaverra's

17  willingness to cooperate and provide information and names.

18  Mr. Scorza at that time indicated that he would review the matter

19  and consult the persons that he was required to consult.  And he

20  contacted me by telephone later that morning and informed me that

21  based on the fact--in fairness to Mr. Scorza--that my client had

22  perjured himself on the witness stand, and there may have been

23  something else if I have left something out--

24     MR. VALUKAS:  We have the letter, your Honor.  We have both.

25  Just so that we will be permitted to submit our response,your Honor.

1327

1    THE COURT:  Oh, by all means.   They both may be made part of

2  the record.

3    MR. SCHULTZ:  In any event, the government elected not to

4  accept his cooperation.  That offer, of course, remains open on the

5  part of Mr. Chaverra if the government would care to reconsider.

6  But the most important thing is what it evidences about

7  Mr. Chaverra's state of mind, having had some time to consider the

8  nature of his conduct and the consequences for his conduct, that he

9  is prepared and is anxious to cooperate with the government and

10  will continue to make himself available to cooperate with the

11  government if they care to take advantage of that offer.

12    I have nothing more to say, your Honor, except to ask that

13  the court exercise its power to be merciful in this matter, that

14  the court consider the sentencing suggestions that would only be

15  suggestions at this point by the United States Sentencing

16  Commission.  I understand that Mr. Chaverra must be sentenced to

17  prison.  There is no question about that.  But I would ask that this

18  court examine and consider his background and the possibility that

19  he could be rehabilitated, consider the fact that he is facing

20  consecutive sentences on the basis of the convictions in the related

21  offense, and that in determining its sentence, this court allow

22  Mr. Chaverra the possibility to return to society, if not society in

23  this country, at least to society where he may some day make a

24  contribution and at least supply a contribution to the welfare and

25  development of his own children.

1    Thank you, your Honor.

2    THE COURT:  Thank you, Mr. Schultz.   Mr. Chaverra, do you wish

3    to say something on your own behalf before the court passes sentence

4    upon you?

5    MR. CHAVERRA:  Yes, your Honor.

6    Your Honor, with your permission, I prepared this written

7    statement myself in order not to forget anything that I wanted to

8    tell you in my statement to you.

9    THE COURT:  Do you wish to read the statement, Mr. Chaverra?

10    MR. CHAVERRA:  Yes, your Honor.

11    THE COURT:  Very well.

12    MS. FUNES:  Your Honor, I am the interpreter.  The statement is

13    an eleven-page statement.  Would your Honor like him to read the

14    entire thing and then I will translate it?

15    THE COURT:  If you can stipulate, the interpreter will read the

16    interpreted statement?

17    MR. VALUKAS:  By all means.

18    THE COURT:  Rather than have it read in Spanish.  You did

19    translate it from Spanish to English?

20    MS. FUNES:  I did not translate it, your Honor.  I received

21    this this morning.

22    THE COURT:  And it is in Spanish, I assume?

23    MS. FUNES:  It is in Spanish.

24    THE COURT:  Would you have any difficulty in translating it

25    "live", so to speak?

1      MS. FUNES:  I have not read it, your Honor.

2      THE COURT:  Would you like some time to read it?

3      MS. FUNES:  It would be a good idea.  If he is going to read it

4  in Spanish, I can translate it.

5      THE COURT:  Then why not have him read it in Spanish, and then

6  you translate it.

7      MS. FUNES:  Very well.

8      THE COURT:  Mr. Chaverra.

9      (Portion of statement read in Spanish by Mr. Chaverra.)

10      THE COURT:  May I ask Mr. Chaverra to just read portions of it

11  so you can translate it as we go along.

12      MR. SCHULTZ:  Maybe paragraph by paragraph.

13      MS. FUNES:  Yes, we will do paragraph by paragraph?

14      THE COURT:  Yes, whichever he is comfortable with.

15      MR. CHAVERRA:  Your Honor, with your Honor's permission and the

16  permission of those who are here present, I wish to express the

17  reality  of the facts as I see them from my point of view, the

18  reality that we have seen in this courtroom  which has been the

19  result of the conclusions reached by the agents of the government in

20  the investigation of my case and which are very different from the

21  realities seen through my heart and seen through my own feelings.

22      I wish to request respectfully of the court, with the same

23  interest that I have given to the arguments presented here, your

24  Honor give the same attention to my version, the version of my

25  reality which is the only truth  that exists for me and which is the

1   only truth.

2       First of all, your Honor, I wish to say that I am

3   innocent in this case, and I shall continue trying through all the

4   possible means and with the help of our Almighty God to prove that I

5   am innocent because I believe, your Honor, that it is not the same

6   thing to speak of than to intend, or send or order something to be

7   done, and in this case, this was my only crime to talk about some-

8   thing that I should have not talked about, as there was no evidence

9   that I had paid any money for any crime to be committed, nor was

10  there any true proof  or overwhelming proof that I had ordered

11  something done.  With regard to this, I wish to explain some of the

12  most important points.

13      First, I wish to speak about the Government's Exhibits

14  E-1 and D-1 in which in neither of them there is any crime written

15  there, nor any suggestion to commit any crimes, and in which there

16  are some words that were misinterpreted from Spanish to English.

17      As far as Exhibit D-1, I wish to clarify the following:

18  Where it speaks of a recipe or a prescription with some little

19  papers in the form of a cross and the name of Mr. Ruben Castillo, I

20  wish to explain to you that this was only a recipe of witchcraft, or

21  that is, in other words, santeria, s-a-n-t-e-r-i-a, this is a belief

22  in African religion which is done through prayers, herbs, candles,

23  verses, et cetera.  The gentlemen of the government believe that

24  this is a code to send someone to kill Mr. Ruben Castillo, but I am

25  telling you that it is not so, and I can prove this because on the

1331

1   6th of May 1987, the MCC confiscated  all of my belongings, and they

2   brought them to the agents of the government,and among those belong-

3   ings, there are several sheets of paper with several prescriptions

4   or recipes, among which there is a recipe, the recipe that I am

5   speaking about in Government Exhibit D-1.  And I would  ask the

6   gentlemen of the government, with all due respect, that they can

7   verify this if they read these pages to which I am referring.  I

8   also have other forms, other ways, in which I can prove what I am

9   saying.

10          With regard to Exhibit TR-2 of the government, I wish to

11  explain the following:

12          As your Honor can see by the conversations about Mr. Ruben

13  Castillo and Mrs. Bertha, they are always initiated by Mr. Ayala and

14  I am trying to avoid them.  Why?  Because this proves that I was not

15  planning anything.  Because this proves that the only person who had

16  interest was Mr. Ayala.  It was neither  because I believed

17  Mr. Ayala had any microphones on him, nor did I try to verify this.

18  And according to what can be seen on the video, we can appreciate

19  the following:  To touch a person who supposedly has a  hidden

20  microphone, it would suffice to touch him, it would suffice to reach

21  your hand out one only time, and if the individual wished not to be

22  detected, he would immediately step back or would make some sudden

23  movement to cover himself, and in the video, we can see that nothing

24  like this happened.

25          Now, the truth, the reality is that we are conversing and

at the same time that I am talking I am at the same time making

movements with my hand several times which, given the angle in which

the camera is set and the angle at which the persons are, it gives

the impression of a different movement, and perhaps Mr. Ayala used

this camera trick to make up a lie, one more lie, and to be able to

say that I was trying to make sure of something.  And the truth is

different, and I can prove this, your Honor, because I am a

photographer, and I saw the video,  and I understood  its purpose.

Returning now to Government Exhibit TR-2, your Honor, I

was telling you that Mr. Ayala always initiated the conversations

because he had his own interests in proving that a crime was going

to be committed which he, himself, was planning because  he was the

one who was going to be benefitted because he was going to gain

indulgence and money and that is why he was interested,  that is why

Mr. Ayala was interested in using any means to make me fall into the

trap that he, himself, built, that he, himself, constructed in order

to win the prize.  That is why his interest...that is why the

interest he shows in the conversation.  And, as you can see, your

Honor, I have no interest in even speaking because on several

occasions, I told him, "No, that I didn't know."  All in all, I

tried to change the topic because the truth was that I did not, nor

did I want anything is the truth.

I really did not wish to cause harm to anyone and I am

very happy and I thank God that no one has suffered any harm because

this was only "speaking", just talking.  But Mr. Ayala insisted so

much in his conversation until he apparently was able to get what he wanted.  As can be appreciated in Exhibit TR-2, it is Mr. Ayala the one who proposes.  He is the one who starts, the one who says, "How?" and "When?", the one who insists and insists.  But at no time did I give him any concrete confirmation.  Neither did I give him any money.  I did not give him any photograph or information.  I did not tell him to bring anybody from anywhere.  Neither did I call or communicate with anyone on the outside.  There is no true or over-whelming proof that I had initiated the action to commit the crime.

        The only proof is everything that Mr. Ayala said in his testimony, and I am going to prove to you, your Honor, with the help of God, that Mr. Ayala lied in his own benefit.  I also want to explain briefly, your Honor, about the part where there is talk about dynamite, grenades and weapons. I said that I knew a place and I knew some people where all these things were sold.  I also said that I had bought a revolver and a gun which I sold later, but I never said and I never did buy or talk about buying dynamite, or grenades, or machine guns with silencers, and I also did not say that I was willing to obtain anything.

        THE COURT:  At this time, we'll take a short recess.

        (Recess at 10:40 a.m.  Proceedings resumed at 10:50 a.m.)

        THE COURT:  Mr. Chaverra.

        MR. CHAVERRA:  Thank you, your Honor.

        I also wish to tell you, your Honor, that when I was under oath, I did not lie to you in anything, your Honor.  I told the

1  truth and I am willing to repeat it as many times as necessary

2  because in the Presentence Report, it says that I committed

3  perjury, but it was not proven, what I lied about was not proven.

4        On the other hand, with all due respect to the court, your

5  Honor, I can  tell you and I can prove to you that Mr. Ayala did

6  lie in many things  that he said.  And there is one thing that I can

7  prove that he lied about, which is, for example when Mr. Ayala said

8  that I had a girlfriend by the name of Sylvia who came to visit me

9  at the MCC and who brought me drugs, and this is a lie of Mr. Ayala.

10  And to prove it, I have with me a sheet of paper from the MCC which

11  states the list of authorized visitors where there is my name and

12  the names of the persons who have come to visit me, and in which the

13  only name that appears  is that of my wife, Chaverra Ruth Urego, who

14  was the only person, the only adult person, who came to visit me

15  along with my children.   The paper has two special dates which

16  state when it was approved by the case manager on October 26, of '86

17  and when it was issued  by my request on November 7, '87.

18      MR. SCHULTZ:  Your Honor, if I may, I would ask that the

19  Metropolitan Correctional Center of Chicago, Illinois, List of

20  Authorized Visitors, the document referred to by Mr. Chaverra, be

21  made a part of the record.

22      THE COURT:  Any objection?

23      MR. VALUKAS:  No objection.

24      THE COURT:  Very well.

25      MR. CHAVERRA:  Another of Mr. Ayala's lies was when he said

1  that he brought me to the United States through Mexico in 1979, and

2  I did not enter through Mexico, nor did Mr. Ayala help me enter the

3  United States, your Honor.  I came to the United States the first

4  time through Miami because my route was through Haîti and the

5  Bahamas, and I can prove this because I still have the passport

6  which states my entry, and, besides, it is noted on the Immigration

7  History when I received my Residence Card.

8        There is another lie which is a little more hard to prove,

9  but which raises much doubt.  This was the occasion on which

10  Mr. Ayala was placed in the cell with me on the fifth floor of the

11  MCC in spite of the fact that I have a strict order by His Honor,

12  Judge Shadur, to not have any contact with any inmate, but which on

13  this occasion it was ignored precisely to put me, to place me, next

14  to Mr. Ayala.  Then Mr. Ayala said that I greet him, that I pound

15  him on the back, that I talk to him about the family, and then I

16  later threaten to kill him and to kill a relative of his.  And the

17  strange thing is for me to greet him so courteously  and to turn

18  around later and threaten him with death, and that he would be so

19  calm about it because I believe that the correct  thing to do would

20  have been to inform immediately the official guard, and then he

21  would have had a witness  to this.  But he could not do this

22  because it was not true,  and he made up this lie, too, later. The

23  same thing about the debt of $79,000 that he said he had to me.

24  And there are still other lies that he said, Mr. Ayala said, but

25  with the help of God, I am going to try to prove these in the

1336

1  future because right now, at this time, I am totally

2  incommunicado,  and under these conditions, it is very difficult for

3  a person to defend himself the way he should be able to.

4      Another thing that I wish to clarify, your Honor, is

5  regarding the two telephone calls that were read by the Attorneys

6  Muslin and Kampenga where they tried to make it believed that

7  Cecilia is my girlfriend and that she is going to come to visit me

8  under another name.  First of all, I am going to explain, your

9  Honor, that when the interpreter, Ms. Haas, read the two transcripts

10  to me before they were read by the attorneys, I immediately brought

11  to her attention, to Mrs. Haas' attention, the errors, the mistakes

12  that there were.  As, for example, on one part, it says, "Amango",

13  A-m-a-n-g-o, and I told her that it was Arango, A-r-a-n-g-o.  And

14  on another part, it said Sylvia, and I told her that it was

15  Cecilia.  And Mrs. Haas told me that she also believed that that's

16  the way it was, but that she had understood it that way, and that's

17  the way she wrote it, which I am sure that if Ms. Haas were to

18  examine the transcript one more time, she would find the mistakes.

19      Now, the basic text of this conversation referred to the

20  fact that Cecilia was going to come visit me without the knowledge

21  of my wife on a special visit.  In the first place, your Honor, she,

22  Cecilia never came to visit me.  And, in the second place, she was

23  going to come visit me without the knowledge of my wife, not because

24  she was my girlfriend,  but only because there had previously been a

25  family dispute between my wife, Cecilia and Cecilia's husband, and

1337

1   for that reason, my wife did not want me to have any contact with

2   them, but I continued my friendship with them without the knowledge

3   of my wife because I had no reason to fight with them.  But I did

4   not want to fight with my wife either, and for this reason, it was

5   that the visit was going to be without her knowledge.  But, besides,

6   Cecilia's husband knew that Cecilia was going to come visit me

7   because we had previously made plans for both of them to come, but

8   at the last moment, it was decided that Cecilia was going to come

9   visit me alone.  But she never was able to come visit me.   And I

10  clarify this, your Honor.  I clarify it that what I am saying I can

11  prove.

12           I also wish to clarify, your Honor, that I did not make

13  any telephone calls to the Ravenswood Hospital, nor did I send any-

14  body to call, nor did I send anybody to go over there, although

15  there is no proof of this, only the bad intention version of

16  Mr. Ayala, as it was the same thing when he said that I sent for

17  these people from Miami, but the case was really, your Honor, that

18  Mr. Ayala was the person who organized everything.  It was Mr. Ayala

19  who sent them to the video on my behalf because I did not know that

20  these people had gone to the video on my behalf.  I became aware of

21  this, that these people had gone to the video through my wife and

22  through my brother-in-law.  And I told them and I said that I didn't

23  want anything to do with them, that I did not need them for any-

24  thing, to tell them to leave.  And this, your Honor, I can prove

25  that what I'm saying is true.  I even told Mr. Ayala, asked him why

1 he had sent these people to the video without my having said any-

2 thing to him and to tell them to leave because I had nothing con-

3 clusive with him.

4       Finally, your Honor, I wish to say to you one more time,

5 and I will continue repeating this until I have the opportunity

6 which I did not have in this case to prove that I am innocent.  I

7 have only left to say, your Honor, that I, as you, and as everyone

8 else who was present here, am a human being, and as all human

9 beings, we make mistakes, and we have the right to be remorseful for

10 them, and to make up for them, and I recognize that I committed my

11 errors.  I ask for forgiveness for them.    I am sincerely remorse-

12 ful, and I am willing to change and to make up for my life as God

13 mandates.  And as every human being, I have the right to have the

14 opportunity given to me to be able to do this.  I ask for your for-

15 giveness for my bad behavior and for my bad expressions, and I beg

16 you to accept my apologies and my remorsefulness.   I respect your

17 decision and would ask you in the Name of God to be just, and for

18 God to bless you, your Honor.

19       To the gentlemen prosecutors of the government, I give my

20 most sincere thanks, and I beg you to please forgive my bad actions

21 and my bad expressions.

22       I especially request, I especially ask Mr. Ruben

23 Castillo's forgiveness.  And I repeat to him once again it was not

24 my intention to harm him because I understood in due time that

25 Mr. Castillo is a faithful servant of the law and, as such, he had

1    to carry out his duties.  I hold no grudges, Mr. Castillo, and I ask

2    you, I beg you, to accept my apologies, and if there is anything I

3    can do for you, I am at your service.

4            Finally, your Honor, and gentlemen prosecutors of the

5    government, I want to ask you for mercy for my children.  According

6    to what I understand through the Presentence Report, the government

7    wants to take away my last belongings that I still have left.  And I

8    would ask you with all due respect, is it fair for four children younger

9    than ten years old to pay for the mistakes of the adults?  No, sir.

10   No, gentlemen, it is not fair.  Because if the government takes the

11   last belongings that I still have, they are not going to be taken

12   away from me because they have already taken everything away from

13   me.  I am in jail where I am going to pay for my faults, and I am

14   not going to need anything.  But those children, they are going to

15   take away from them the bread from their mouths.  Those children,

16   they are going to be taking  away an education for them, and they

17   are going to ruin their future because it is they who will be

18   harmed.  It is those children, orphans, orphans and defenseless

19   children, who are going to be damaged.  It is those four minor

20   children younger than ten years  who are going to pay for the

21   consequences.  Besides, gentlemen of the government, I also worked

22   honestly and I also made money legally, and I also paid taxes

23   correctly, and I acquired my assets legally, and I complied with all

24   of the obligations that are mandated by law with regard to that.

25   And I beg you, gentlemen of the government, be fair and have mercy

1  for those children who should not pay for our mistakes.

2         Finally, I wish to say that I am not a criminal, nor am I

3  a danger.  I beg of you, Mr. Prosecutor, please have compassion on

4  me and at least allow me to call my children on the telephone.

5  Understand, if you are a father, what you feel for your children and

6  what I am feeling for mine.

7         Thank you very much.  And may God bless you.

8         Your Honor, I wish to ask of you as my last wish

9  respectfully  to allow me some additional time to remain here in

10  Chicago before I am transferred to another prison in order to look

11  for an attorney who can help me with my appeal and who could help me

12  to defend my rights and to be able to prove to your Honor that I am

13  innocent.  I give you my most sincere thanks for your attention

14  given, and may God bless you.

15         Thank you very much.

16     THE COURT:  Thank you.  Anything further?

17     MR. CHAVERRA: Wait!  Your Honor, when I say that I am innocent,

18  I mean that I am innocent in the sense that I did not send anybody

19  to go out and commit any crimes, nor did I commit the crime.  And I

20  do recognize that I did make the mistake of speaking and talking

21  things that I should not have talked.  That is all, your Honor.

22  Thank you very much.

23     THE COURT:  Thank you.  Does the government have anything to

24  say in this case in mitigation or aggravation?

25     MR. VALUKAS:  Aggravation, your Honor.   Your Honor, let me

1    clarify one point.  Judge Shadur specifically addressed the question

2    involving the underlying drug case and did not take into consider-

3    ation any of the facts involved in this matter in arriving at a

4    sentence.  And the government in the matter before Judge Shadur,

5    where Mr. Chaverra is sentenced to 15 and 15 consecutively for 30

6    years total, specifically did not bring any matters to the court's

7    attention in aggravation so this was not considered by Judge Shadur

8    in determining the appropriate sentence for the offense in which

9    Mr. Chaverra was involved.

10    Let me be brief, your Honor.  Your Honor sat through the

11    trial which occurred recently, and your Honor knows that this

12    wasn't a question of conversation.  In fact, while staying in the

13    MCC, he did discuss the murder of four human beings with Mr. Ayala.

14    His cohorts and his associates were similarly aware of the situ-

15    ation, were planning and plotting that while they were talking to

16    the government agents on the street.  This was not a matter of

17    conversation or idle discussion between Mr. Chaverra and Mr. Ayala.

18    Mr. Chaverra's associates in his drug cartel were in the process of

19    discussing with the government agents the fact that they had

20    already hired killers to accomplish the goal, and the goal was to

21    murder four people.

22    Mr. Chaverra is a very intelligent and cunning man.  He is

23    a very articulate individual.  That was obvious from his statements

24    here today.

25    Mr. Chaverra expresses concern about his children.

1  Mr. Chaverra's business was dealing death through drugs.  Actually,

2  we are concerned about children.  Mr. Chaverra for a period of years

3  was one of the major cocaine suppliers in the Northern District of

4  Illinois.  Mr. Chaverra's cocaine is the cocaine which is used by

5  our children throughout the Northern District of Illinois.  That is

6  how it is that Mr. Chaverra's family and his associates made their

7  living.

8          Mr. Chaverra's activities are the activities that this

9  entire community must work against.  That is the reason why we are

10  working full time with the Board of Education to establish drug

11  education programs so that the 11-year old, the 12-year old, and

12  thereafter will not be taking the drugs that Mr. Chaverra was

13  peddling through his organization.

14          The profits which Mr. Chaverra made through this organiza-

15  tion based on the amount of cocaine that was seized on the last

16  occasion had to be in the millions of dollars, and those millions of

17  dollars were obtained through children and young adults who were

18  buying that which Mr. Chaverra was supplying.  That reflects

19  Mr. Chaverra's great concern for children.

20          But we are not talking about sentencing him on the drug

21  charges.  We are talking about what happened after Mr. Chaverra and

22  his associates got caught with the drugs because Mr.Chaverra and his

23  associates do business in a manner which is contrary and different

24  from what most Americans understand about their lives.

25          In Mr. Chaverra's business world, murder is a part of the

1  business activity.  Today, the highest murder rate in the world is

2  in Colombia, the country which is supplying the cocaine.  The

3  cartels which are involved  in dealing the drugs expect that

4  murder is an aspect of their doing business.  It is a common fact and

5  known that the first place in which these crimes of assassination

6  occur deal with the government witnesses and those who are in the

7  Criminal Justice  System because that is the way business is done,

8  and in this particular situation, it was simply a business decision

9  for Mr. Chaverra and his associates to kill a government witness and

10  her two children.  It was a business decision, nothing more, nothing

11  less.  It was a decision that if they were killed, that Mr. Chaverra

12  would be less likely to be found guilty in a courtroom in this

13  country.  That is what it was about.

14        The violence, and death and assassination were a common

15  and accepted part of their business.  To listen to the tone of voice

16  on the tapes as he and Mr. Ayala calmly discussed the murder of

17  human beings is to understand what this business is all about.

18        What Mr. Chaverra was talking about doing he was talking

19  about doing something  for which, in my knowledge, no one in this

20  District has ever been convicted, that is, talking about killing an

21  Assistant United States Attorney because that Assistant United

22  States Attorney was doing his job.

23        What Mr. Chaverra was found guilty of and found guilty of

24  beyond a reasonable doubt was plotting the deaths of four human

25  beings to advance his business activities, his drug dealing

1    activities.  He suggests that there ought to be rehabilitation.  I

2    find that as cynical a statement as I have heard in twenty years in

3    practicing law.  The man's business was drugs.  Part of his busi-

4    ness activity was discussing murder.  There is no suggestion

5    throughout this period of time that he was anything other than a

6    drug dealer who used these other businesses as a front for his

7    activities.

8         There is no discussion about any tax information.  You

9    will recall on  cross examination we got into that point.  The

10   suggestion that he is some sort of small businessman belies the

11   business position which Mr. Chaverra held within the drug cartel

12   and belies the position that he had with regard to these particular

13   activities.  Rehabilitation isn't even a question that should be

14   before this court.  The questions that are before this court

15   should be retribution, and punishment, and deterrence, and I will be

16   brief, your Honor.

17        Just based on what it was that he was in the process of

18   doing, not thinking about doing, not talking about doing, but, in

19   fact, doing, was plotting the murders of four people, that crime is

20   entitled to the most severe punishment.

21        What he had put in place was not just conversations with

22   Eddie Ayala, and confirmed out of the mouths of his associates and

23   relatives, but that he had put assassins on the street for the

24   purpose of murdering the government witness, and it was only because

25   we were involved at the earliest possible step that there was no

1   death involved in this situation.  His stating to the court today

2   that no one was hurt was, indeed, a cynical statement because what he

3   was planning was death.

4           Your Honor, there is only one way to stop people like

5   Mr. Chaverra, people who make their millions of dollars by being

6   part of this cartel activity and dealing drugs, and who then decide

7   that murdering witnesses is an acceptable way of doing business in

8   this District, and that is to mete out a sentence which will deter

9   others from getting involved in this activity.

10          We ask that he be sentenced to life imprisonment

11  consecutive to the thirty years which he received from Judge Shadur.

12          THE COURT:  Did Judge Shadur impose a fine in those cases?

13          MR. VALUKAS:  I am not aware if he did or not.

14          MR. SCHULTZ:  Yes, the fine that was imposed was $50 on each

15  count.

16          THE COURT:  That was the assessment imposed, not fine.  Any-

17  thing further before the court passes sentence upon Mr. Chaverra?

18          MR. SCHULTZ:  Nothing further, your Honor.

19          THE COURT:  Thank you.

20          Mr. Chaverra, there is no question in this court's mind

21  that but for the fortuitous event that Eddie Ayala met you at the

22  MCC, there would be at least two innocent children and their mother

23  dead.  Ruben Castillo is something else.

24          Based on the testimony that this court has heard during

25  the course of the trial, the court finds that your crime is one that

1  requires the full weight of the law to be brought against you.

2  Your actions, Mr. Chaverra, struck at the very essence of our

3  Criminal Justice System.  And there is no question in this court's

4  mind that I would be violating my office if I were to impose a

5  sentence in this case which was not commensurate with that serious

6  crime in order to send a clear and unmistakable message to all

7  others who     think of commiting such a heinous crime, that is,

8  to undermine our judicial system.

9        I have compassion for your children.  I don't know what

10 you have by way of supporting them.  For that reason,  I am not

11 going to impose a fine in this case.  There is no indication that he

12 has anything that I can see.

13     MR. VALUKAS:  We have not located anything else, your Honor.

14     THE COURT:  I am not going to suffer your crime to be placed

15 on the heads of your children.  But that is all you are entitled to,

16 Mr. Chaverra.

17     MR. CHAVERRA:  Muchos gracias, your Honor.

18     THE COURT:  I beg your  pardon?

19     MS. FUNES:  "Thank you, your Honor."

20     THE COURT:  It is the sentence of this court that the

21 defendant be sentenced to a term of life imprisonment, which is the

22 maximum sentence that this court can impose on Count One.

23        It is further the sentence of this court that that

24 sentence on Count One be served consecutively to the sentence

25 imposed in Case 86 CR 740-4.

1    With reference to the charges that you were convicted of

2  on Count Two, the court imposes a sentence of five years in the

3  custody of the Attorney General, again, the maximum sentence the

4  court can impose.

5    With reference to the offenses which you were convicted of

6  in connection with Count Three, the court imposes a sentence of

7  twenty years in the custody of the Attorney General, again, the

8  maximum sentence that the court can possibly impose.

9    Finally, on Count Four, the court again imposes the

10  maximum sentence on Court Four, five years.

11    The sentences on Counts Two, Three, and Four are to be

12  served concurrently with each other and concurrently with the

13  sentence imposed of life imprisonment on Count One.

14    There will be an assessment in the amount of

15  count.

16    Finally, Mr. Chaverra, you are advised that it is your

17  right to appeal from this court's judgment and sentence within ten

18  days.  Your failure to appeal within the ten days will be a waiver

19  of your right to appeal.

20    The court further advises you that you are entitled to

21  the assistance of counsel in taking any such appeal, and upon

22  your request for a lawyer and a showing of cause that

23  you cannot afford such a lawyer, the court will provide a lawyer at

24  the government's expense.

25    Obviously, the defendant is in custody.

1        With reference to your request that you remain

2    incarcerated at the MCC, I have no control over that.  The Bureau

3    of Prisons, as I understand it, is the only one that can control

4    that.

5        If there is nothing further, take him away.

6

7                              ———

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25